EXHIBIT A

Stuart Smith - June 13, 2006
Case 2:05-cv-01026-KJD-GWF  LVRC Holdings, LLC vs. Brekka
Document 47-2  Filed 09/01/06  Page 2 of 48

Page 15

1    **not all of the people who attend meetings of Narcotics**

2    **Anonymous, are persons who are in recovery, or not in**

3    **recovery, in respect to narcotics addiction?**

4                    **Is that a fair statement?**

5         A       That would be the stated purpose of the

6    organization.  Again, I don't believe there is any

7    membership rolls or anything like that.  I think it's

8    more of a self reporting or self identification.

9                    I also believe a number of the

10   meetings are open.  You have visitors and other people

11   who seem to hang on and attend for whatever purpose.

12        **Q       Mr. Chris Brekka and Carolyn Quain, the**

13   **Defendants in this case, also attend meetings of**

14   **Narcotics Anonymous.  Did you first meet them, one or**

15   **both at such a meeting?**

16        A       At a Narcotics Anonymous meeting?

17        **Q       Yes?**

18        A       No.  I believe I met Mr. Brekka -- he was

19   dating Ms. Quain.  It was at her house, like, one of the

20   college football bowl games.

21        **Q       What college?**

22        A       I believe it was when Alabama beat the

23   University of Miami, `97, `98.

24        **Q       Was that in Coral Gables, Miami?**

25        A       What do you mean?

Stuart Smith - June 13, 2006
Case 2:05-cv-01026-KJD-GWF LVRC Holdings, LLC vs. Brekka Document 47-2 Filed 09/01/06 Page 3 of 48

Page 16

1        **Q**      **Where was the ball game?**

2        A      It was at her house.  I don't remember

3  where it was.  It was on television.

4        **Q**      **Did you know Ms. Quain before you knew**

5  **Mr. Brekka?**

6        A      I had met her before him.

7        **Q**      **Approximately how long have you known Ms.**

8  **Quain?**

9        A      Approximately 20, 21 years.

10        **Q**      **And did you have frequent contact with Ms.**

11  **Quain?**

12        A      Not really.

13        **Q**      **About how frequently over the 20 years, did**

14  **you have contact with Ms. Quain?**

15        A      When I first met her, I would see her at

16  volunteer activities related to Narcotics Anonymous and

17  other events they were sponsoring, every two, three, four

18  months, something like that, so a couple dozen times,

19  something like that.

20                Then for a long period, no contact.

21  I saw her and met him for the first time at her house,

22  and --

23        **Q**      **Go ahead.  I am sorry.**

24        A      -- that kind of contact varied.

25        **Q**      **Did you become good friends with Ms. Quain?**

Page 7

1    Q.    Well, just because I know you've sat
2  through it, I'll hopefully do a short form version,
3  but I want to be sure that we still have everything
4  on the record.
5         First, you've been given an oath by the
6  court reporter. And that oath is the same oath that
7  you would get in a court of law, and it carries the
8  same weight and penalties.
9         Do you understand that, sir?
10   A.    Yes.
11   Q.    Okay. Number two is, because this is --
12  even though we're videotaping this, there's still a
13  court reporter taking this down in stenography, by
14  stenographic means, and what that will result in is
15  a booklet. And so, in order for a clear record to
16  appear in that booklet, it's important that you use
17  verbal answers, "yes" and "nos."
18        Do you understand that?
19   A.    Yes.
20   Q.    And secondarily, that even though we may
21  anticipate where we're heading with the
22  conversation, it's important that you allow me to
23  finish my questions, I allow you to finish your
24  responses. That way we get a clear record.
25        Is that fair?

Page 8

1    A.    Yes.
2    Q.    Another thing is if you need to take a
3  break at any time, as long as there's no question
4  pending, we can take a break, I don't have any
5  problem. If there is a question pending, I will ask
6  that you answer the question, upon which we can then
7  take the break.
8         Is that fair?
9    A.    Yes.
10   Q.    And as a final point, well, two final
11  points, one being if you don't understand any of my
12  questions, please ask me to rephrase them. Please
13  let me know you don't understand. If you're
14  confused, ask me to restate. I will try to clarify
15  where we're going with it. I know sometimes
16  questions can seem confusing as they come out. So
17  in order to get a clear record, so that we both are
18  talking about apples and apples, if you have any
19  problems, please let me know, and I'll be happy to
20  restate.
21        Is that fair?
22   A.    Yes.
23   Q.    As a last matter, are you under the
24  influence of any narcotics, alcohol, or any other
25  drugs, treatments, that would affect your ability to

Page 9

1  testify fully, completely, and accurately here
2  today?
3    A.    No.
4    Q.    Mr. Brekka, what do you do for a living
5  currently?
6    A.    I own a company called Employee Business
7  Solutions.
8    Q.    And is that a single company or is there
9  multiple employees --
10   A.    There are two companies.
11   Q.    I'm sorry. Just let me get my question.
12   A.    I apologize.
13   Q.    That's okay.
14        Are there more than one Employee Business
15  Solution companies?
16   A.    There is.
17   Q.    Where are both of those companies located?
18   A.    One of them is located in Florida. The
19  second one is located in Nevada.
20   Q.    Do you own both of those companies?
21   A.    I do.
22   Q.    Do you differentiate -- if I say EBS, do I
23  need to differentiate between the Nevada and the
24  Florida corporation?
25   A.    Yes.

Page 10

1    Q.    So when I ask you what you currently do
2  for a living, you own a company EBS, and you own
3  both of those companies; correct?
4    A.    Yes.
5    Q.    Do you do work for both of those
6  companies?
7    A.    Yes.
8    Q.    Starting with the Florida corporation --
9  actually, I should ask you, which corporation was
10  formed first?
11   A.    Florida.
12   Q.    And do you recall when the Florida
13  corporation was created?
14   A.    1999.
15   Q.    And what type of services does the Florida
16  corporation provide?
17   A.    It is an employees assistance company and
18  a consulting company.
19   Q.    Excuse me. What is an employee assistance
20  company?
21   A.    We offer services to businesses to help
22  their employees with any kind of adverse situation.
23  We're an external provider for companies to do, set
24  up their EAP programs, employees assistance
25  professional programs. And any adverse situation an

LITIGATION SERVICES & TECHNOLOGIES

Page 11

1   employee may have, they can contact us and we meet
2   with them.
3       Q.    So, for instance, if an employee of a
4   company that you represent is having, say, a drug
5   problem, they would call you?
6       A.    They can contact us.
7       Q.    And you also said you do some consulting?
8       A.    I do.
9       Q.    And what type of consulting do you perform
10  out of the Florida corporation?
11      A.    Business development for mental health and
12  substance abuse services.
13      Q.    What does business development entail?
14      A.    Marketing for treatment centers, mental
15  health providers.
16      Q.    And do those marketing services include
17  print ads?
18      A.    No.
19      Q.    Do those marketing services include
20  television?
21      A.    No.
22      Q.    Do they include radio media?
23      A.    No.
24      Q.    Do they include what I'm going to term,
25  for lack of a better word, knickknacks, like pens

Page 12

1   with names, those sort of things?
2       A.    No.
3       Q.    Then what does marketing actually entail?
4       A.    Business development, meeting with
5   potential referral sources, potential clients, and
6   some Internet advertising.
7       Q.    Have you been providing all of those
8   services under your consulting banner since 1999?
9       A.    Correct.
10      Q.    And moving on to the Nevada corporation,
11  when was it formed?
12      A.    2004.
13      Q.    And why did you form the Nevada
14  corporation?
15      A.    I had plans to expand my business and do
16  business in Nevada.
17      Q.    Was there any strategic reason that you
18  decided to start a second Nevada corporation instead
19  of just having the Florida corporation authorized to
20  do business in Nevada?
21      A.    No.
22      Q.    And, again, what type of services does the
23  Nevada corporation provide?
24      A.    It mirrors the Florida corporation.
25      Q.    And how do you differentiate between

Page 13

1   performing services that you're doing for the
2   Florida corporation versus the Nevada corporation?
3       A.    Business that I have in Nevada goes under
4   the Nevada corporation.
5       Q.    So any other business outside of Nevada
6   would go under the Florida corporation?
7       A.    Correct.
8       Q.    And where is the offices of the Florida
9   corporation located?
10      A.    8491 Northwest 19th Street, Pembrook
11  Pines, Florida.
12      Q.    You maintain actual office space there?
13      A.    I do.
14      Q.    And where are the offices in the Nevada
15  business located?
16      A.    10386 Miners Gulch Avenue, Las Vegas,
17  Nevada, 89135.
18      Q.    And that's your home?
19      A.    Correct.
20      Q.    And do you have separate billing for the
21  Florida and Nevada corporations?
22      A.    Yes.
23      Q.    And who are the shareholders in the
24  Florida corporation?
25      A.    I am.

Page 14

1       Q.    The sole shareholder?
2       A.    Correct.
3       Q.    Who are the shareholders in the Nevada
4   corporation?
5       A.    I am.
6       Q.    The sole shareholder?
7       A.    Yes.
8       Q.    With regard to the Florida corporation,
9   who are the officers?
10      A.    Myself.
11      Q.    And just you?
12      A.    Yes.
13      Q.    With the Nevada corporation, who are the
14  officers?
15      A.    Myself and my wife, Carolyn Quain.
16      Q.    And what is Ms. Quain's officer title?
17      A.    She is the secretary.
18      Q.    Does she have any duties as secretary?
19      A.    Just when we have a board meeting, takes
20  minutes.
21      Q.    And how many employees are there in the
22  Florida corporation?
23      A.    One, myself.
24      Q.    And with the Nevada corporation?
25      A.    One, myself.

Page 83

1   regard to the employment agreement were?
2       A.      Yes.
3       Q.      What, from your perspective, were those
4   disagreements?
5       A.      That I would be personally liable for
6   anything if LVRC was to not be successful. And I
7   was at Mr. Smith's whim if I signed the agreement.
8       Q.      How would you have been personally liable
9   if LVRC had not been successful?
10      A.      Mr. Smith could have taken action against
11  me.
12      Q.      In what respect?
13      A.      Financially.
14      Q.      And what do you mean by if LVRC was not
15  successful?
16      A.      If it would have went under, if it would
17  have folded.
18      Q.      You're saying that --
19      A.      I could have been financially responsible
20  for the debt.
21      Q.      So your understanding was that if
22  something had happened financially with LVRC,
23  Mr. Smith could seek compensation from you for that?
24      A.      Correct.
25      Q.      Were there any issues about you becoming

Page 84

1   an owner of LVRC?
2       A.      Yes.
3       Q.      Was that part of the agreement you were
4   negotiating as well?
5       A.      Yes, it was.
6       Q.      Do you recall what stake in LVRC, what
7   percentage ownership you were seeking?
8       A.      I believe the agreement stated, like, 27
9   percent, 28 percent.
10      Q.      Do you recall how much you were going to
11  have to pay for that?
12      A.      I do not.
13      Q.      Was there going to be a payment for that?
14      A.      Yes, there was.
15      Q.      So it was a payment, not necessarily a
16  service, for the 27 percent?
17      A.      I believe both.
18      Q.      And so, at some point, you -- at some
19  point, the agreement just couldn't be reached?
20      A.      Correct.
21      Q.      Then from that point what ended -- what
22  happened to cause you to leave LVRC?
23      A.      I had a phone conversation with Stuart
24  Smith. I told him that the agreement was
25  unacceptable. He stated that I would become a

Page 85

1   consultant for him. I told him I would think about
2   it for a few days, and never got back to Mr. Smith.
3   Or I may have gotten back to him and let him know
4   that I was going to be leaving LVRC.
5               MR. GOCHNOUR: How much time do we have?
6               THE VIDEOGRAPHER: A minute.
7               MR. GOCHNOUR: Why don't we take a break,
8   since we're going to have to change the videotape.
9               THE VIDEOGRAPHER: Off the record at
10  11:18.
11              (Short recess)
12              THE VIDEOGRAPHER: Back on the record at
13  12:38.
14  BY MR. GOCHNOUR:
15      Q.      Okay, Mr. Brekka, we're back from lunch.
16  Hopefully, we've all had a delicious meal and feel a
17  little bit better.
18              I want to turn a little bit to, again,
19  your actual job duties while you were employed at
20  LVRC.
21              Your employment was from about April of
22  2003 to September of 2003?
23      A.      Yes.
24      Q.      And how did it come that you became
25  involved with LVRC?

Page 86

1       A.      I approached Stuart Smith and Frank Szabo
2   about an opportunity of opening a treatment center
3   in Las Vegas.
4       Q.      And how did you know Mr. Smith and
5   Mr. Szabo?
6       A.      Mr. Smith was a dear friend of mine, and
7   Mr. Szabo was more of an acquaintance that I had met
8   at a Narcotics Anonymous convention.
9       Q.      Were they in the process of looking for a
10  treatment facility to open somewhere?
11      A.      They were not.
12      Q.      How did you decide to approach, again,
13  just say Stuart and Frank, as opposed to Mr. Szabo,
14  excuse me, as opposed to somebody else?
15      A.      I had identified a treatment facility that
16  was not occupied, and I had called Frank Szabo and
17  asked him if he would take a ride and take a look at
18  the facility. And I approached Stuart Smith about
19  the opportunity of a treatment center in Las Vegas.
20      Q.      How did you identify that there was a
21  nonoperating facility in Las Vegas?
22      A.      I had done a search. I was looking for an
23  opportunity to open a treatment center. And in my
24  research, I came across the Fountain Ridge website,
25  and contacted them and was told that the facility

LITIGATION SERVICES & TECHNOLOGIES

Page 87

1  was under other management, but that Don Herman was
2  open to negotiating a sale of the facility.
3      Q.    So were you involved with negotiating the
4  sale of the facility?
5      A.    I was not, only from, peripherally.  I had
6  identified.  And once I approached Stuart with that
7  proforma that I had designed of a treatment center,
8  Stuart picked up the ball and did the actual
9  negotiations of the sale of the facility.
10          MR. KIRSHMAN:  Excuse me.  Is there any
11  way to put a little more air in here?  Thank you.
12  BY MR. GOCHHOUR:
13     Q.    Did you ask for or receive any type of
14  finder's fee or anything like that?
15     A.    No.
16     Q.    When you approached Mr. Smith about
17  possibly buying the Fountain Ridge facility or the
18  assets, however the deal was ultimately structured,
19  what was your interest in this going to be, in this
20  project?
21     A.    That I was going to be an owner of a
22  treatment center.
23     Q.    And in what respects would you have been
24  one of the owners of the treatment center?
25     A.    I would put some money down, and we would

Page 88

1  work a financial arrangement where I would borrow
2  money and pay back Mr. Smith.
3      Q.    Was there ever a deal or a document that
4  was signed to that effect?
5      A.    No.
6      Q.    Was that part of what you were trying to
7  negotiate with the employment agreement?
8      A.    Yes.
9      Q.    So you started in April of 2003.  Do you
10  recall what your position was at LVRC?  Did you have
11  a position?
12     A.    I don't recall.
13     Q.    Did you have any job duties around that
14  time?
15     A.    I did.  The setting up of the operation to
16  open a treatment center.
17     Q.    And at some point, LVRC was open and
18  operating?
19     A.    Yes.
20     Q.    Once that happened, what were your job
21  duties at LVRC?
22     A.    I did operations, marketing.
23     Q.    And what were your operations duties?
24     A.    Day-to-day operations.  Oversaw the
25  admissions department, set up the Internet

Page 89

1  marketing.
2      Q.    Anything else?
3      A.    Met with doctors, staffs, potential
4  clients.  Notified my contacts that I was part of a
5  new venture.
6      Q.    With regard to just -- I think part of
7  what you stated was you had some sort of supervision
8  or oversight on the day-to-day operations?
9      A.    Day-to-day admissions.
10     Q.    And you oversaw the admissions department
11  then?
12     A.    Correct.
13     Q.    And who was the admissions department?
14     A.    One employee, Tom Cook.
15     Q.    And what did Mr. Cook do, as part of the
16  admissions?
17     A.    He was the admissions coordinator.  He
18  answered the phone on prospective calls, verified
19  medical coverage, verified financial eligibility,
20  did a prescreening to make sure that the client was
21  clinically appropriate.
22     Q.    Was Mr. Cook the only person performing
23  those services?
24     A.    Yes.
25     Q.    Did you ever perform any of those

Page 90

1  services?
2      A.    Yes.
3      Q.    Did you do that on a daily basis?
4      A.    No.
5      Q.    How often would you be involved in those
6  activities?
7      A.    Two times a week.  Tom went to lunch, on a
8  break, I'd pick up his duties.
9      Q.    And were you in any way involved in
10  training Mr. Cook?
11     A.    Yes.
12     Q.    Would you say that you had more
13  involvement with the admissions duties early on and
14  more of it shifted to Mr. Cook as time went on; is
15  that a fair statement?
16     A.    Yes.
17     Q.    So potential patients would call in.  And
18  primarily Tom Cook, but once in a while you would
19  take the calls?
20     A.    Correct.
21     Q.    And you would go through and verify
22  medical coverage, financial ability, prescreen them
23  to see if they were appropriate for that facility?
24     A.    Almost all of that.  The medical coverage
25  was verified by another employee.

LITIGATION SERVICES & TECHNOLOGIES

Page 91

```
1    Q.    Who verified the medical coverage?
2    A.    I believe her first name is Iris.  I do
3  not know her last name.
4    Q.    If they were appropriate, you would then
5  do whatever needed to continue on with the
6  admissions process?
7    A.    Correct.  Schedule an appointment for them
8  to come in, look at the facility, be evaluated for
9  possible admission.
10   Q.    Were you part of that process after?
11   A.    Just on the introductory of, hi, how are
12 you.
13   Q.    So you wouldn't be involved in the -- you
14 used the term that starts with an A, and I'm sorry,
15 like, analysis or --
16   A.    Appropriateness?
17   Q.    Where they would sit down with a counselor
18 perhaps?
19   A.    I don't recall.
20   Q.    I mean, would you be involved in, that's
21 it, it was assessment of the patient?
22   A.    No.
23   Q.    And let's say you had a patient that was
24 inappropriate for LVRC.  What would happen to that
25 particular patient?
```

Page 92

```
1    A.    They would be referred to an agency that
2  could assist them.
3    Q.    Did you have a list of agencies at LVRC
4  that you referred people to?
5    A.    Yes.
6    Q.    That was part of LVRC's admissions
7  process, if they don't meet ours, send them out to
8  these people?
9    A.    Part of the criteria that we established
10 was we should give everyone that's looking for
11 services a referral if we cannot help them.
12   Q.    Was there a list kept of the people that
13 you could or should refer these patients out to?
14   A.    Yes.
15   Q.    Were you involved in developing that list?
16   A.    No.  Well, the local list was already
17 established.
18   Q.    By who?
19   A.    Tom Cook.
20   Q.    Okay.  Was there a non-local list?
21   A.    On a broader scale, our marketing efforts
22 were also a national marketing effort.  If we had an
23 inquiry from another city, at times, I did provide
24 resources to Tom.
25   Q.    And, again, I believe you testified,
```

Page 93

```
1  please correct me if I'm wrong, that none of those
2  referrals would have been done by EBS?
3    A.    Correct.
4    Q.    When you referred somebody out, was there
5  any kind of formalized process, like somebody would
6  know that LVRC was referring patients to them?
7    A.    I believe Tom kept a log.
8    Q.    But there wasn't some sort of introductory
9  document sent or here's the information on this
10 patient, they may be calling, anything like that?
11   A.    On occasion, I would.
12   Q.    On occasion, what would you actually send?
13   A.    Possibly a cover sheet and an intake form.
14   Q.    And that would be the intake form that you
15 -- was there a form intake form, in other words, a
16 standard intake form that you used at LVRC?
17   A.    There was.
18   Q.    Would that be what you sent along with
19 this cover sheet?
20   A.    I believe so.
21   Q.    In regard to the admissions process, did
22 you have any other duties that we haven't discussed?
23   A.    Not that I can recall.
24   Q.    And you also had marketing functions?
25   A.    Yes.
```

Page 94

```
1    Q.    And that included Internet marketing?
2    A.    Correct.
3    Q.    Did you set up the LVRC Internet
4  marketing?
5    A.    Yes.
6    Q.    And what did that entail?
7    A.    Pay-for-click advertising on Google.
8    Q.    Is that all?
9    A.    I also met with Nick Jones and coordinated
10 the design of a new website.
11   Q.    Nick Jones is with LOAD, Ltd.; correct?
12   A.    Yes.
13   Q.    And that was the Internet service
14 provider?
15   A.    That was the website host.  I believe Cox
16 Communications is the Internet service provider.
17   Q.    So your website was with LOAD, Ltd.  Did
18 you do any other -- were there any other computer
19 functions that you were responsible for at LVRC?
20   A.    I became responsible for setting up the
21 email.
22   Q.    What did you do to set up the email
23 system?
24   A.    Nick Jones hosted the email accounts.  And
25 he provided me with a user name and password to set
```

LITIGATION SERVICES & TECHNOLOGIES

Page 95

1  up and delete email accounts.
2      Q.    And, again, just so we have a common
3  definition, you said he provided you with a user
4  name and password that allows you to access and
5  delete email. We've been trying to refer to that, I
6  think, as the administrative function throughout
7  this litigation or something, usually
8  administrative. And then we all have a different
9  word that we all like to use. , But I'll use
10 function. Is that fair as a definition?
11     A.    Okay.
12     Q.    So there was an administrative function
13 set up with LOAD; correct?
14     A.    Yes.
15     Q.    And that allowed you to then use this
16 function to go in and add and delete emails?
17     A.    Correct.
18     Q.    If somebody had lost their password, you
19 could go in and either find their password or give
20 them a new password?
21     A.    No.
22     Q.    What happens if somebody lost their
23 password?
24     A.    Had to contact Nick Jones.
25     Q.    And did the administrative function allow

Page 96

1  you to do anything besides add and delete emails?
2      A.    No. Email accounts, not emails.
3      Q.    I'm sorry. Accounts for specific users;
4  correct?
5      A.    Yes.
6      Q.    So if Mr. X was hired, you could go set up
7  Mr. X with an email account?
8      A.    Correct.
9      Q.    And if Mr. X was fired, you could go in
10 and delete his email account?
11     A.    Correct.
12     Q.    Were there any kind of statistics that
13 were kept by LOAD, Ltd. or generated by LOAD, Ltd.
14 that you reviewed?
15     A.    Yes.
16     Q.    And what were those statistics?
17     A.    I believe they were called LOAD stats.
18     Q.    What would be on LOAD stats?
19     A.    The information on the stats for the
20 website, where hits came from, possibly what key
21 words someone typed into a search engine to find a
22 website, how many hits per day, what part of the
23 country that hit came from.
24     Q.    Anything else?
25     A.    I think that's it.

Page 97

1      Q.    Do you understand what the term "DNS"
2  means?
3      A.    No.
4      Q.    Domain name server?
5      A.    No.
6      Q.    And one of the things it allowed you to
7  look at was possibly the key words that somebody was
8  using to get to your site?
9      A.    Yes.
10     Q.    Were those the same type of key words that
11 you were bidding for in the pay-for-click?
12     A.    It could be.
13     Q.    Just so we're clear, for the record,
14 pay-per-click is the word pay, separate word, P-E-R,
15 per, and then click; is that correct?
16     A.    I think so.
17     Q.    I was just saying it, and I didn't want it
18 to come out on the record as the word "paper" and
19 then "click."
20     A.    Right.
21     Q.    But in the statistics, you would look at
22 those key words. Would that allow you to make the
23 choice or at least -- choice is not the proper word.
24 Would it allow you to look at the information and
25 decide how much you were going to bid for use of

Page 98

1  certain key words?
2      A.    It was a tool that I did use.
3      Q.    And what did that tool allow you to do?
4      A.    It allowed me to see what key words
5  someone typed in. And if it was relevant, I may
6  look to use it as a pay-for-click word.
7      Q.    Is there any kind of statistics that
8  allowed you to alter the text or design of the
9  website to increase your chances of coming up on a
10 search engine such as Google or Yahoo?
11     A.    Not that I had the function to do.
12     Q.    You didn't have a function to do that?
13     A.    No.
14     Q.    But you think there was stats at LOAD that
15 allowed you to do that?
16     A.    No. LOAD could do that. The designer of
17 the website could do that.
18     Q.    And the designer of the website worked for
19 LOAD?
20     A.    Yes.
21     Q.    And with regard to that administrative
22 function -- well, the statistics, was that part of
23 that administrative function?
24     A.    I was able to view the statistics for the
25 website, yes.

LITIGATION SERVICES & TECHNOLOGIES

| Message0662 |
|---|
| **Subject:** Fw: Fountain Ridge Web Stats |
| **From:** Chris Brekka |
| **To:** Cbrekka@att.net |
| **Message Body** |

----- Original Message -----
From: Nick Jones
To: Chris Brekka
Sent: Monday, June 02, 2003 2:20 PM
Subject: RE: Fountain Ridge Web Stats


Chris,

I've placed the code on your site this morning. You can see the traffic statistics by going to the following link.

http://www.load.com

Your login information is:

E-Mail Address: cbrekka@fountainridge.com
Password: cbrekka

You can change your password once you login to your account.

If you have any other questions, please let me know.

Nick
-----Original Message-----
From: Chris Brekka [mailto:cbrekka@worldnet.att.net]
Sent: Monday, June 02, 2003 8:54 AM
To: nick@load.com
Subject: Fountain Ridge Web Stats


Nick,

I need to start analyzing the Fountain Ridge website stats. Please email to directions on how to excess this information.

Thanks

Chris

EXHIBIT
Brekka 10
7/21/06   KF

| **Outlook Header Information** |
|---|

Conversation Topic: Fountain Ridge Web Stats

Sender Name: Chris Brekka
Creation Time: 12/2/2003 7:45:30 AM
Modification Time: 12/2/2003 7:45:30 AM
Submit Time: 6/3/2003 5:50:28 PM
Importance: Normal
Flags: 1 = Read
Size: 5778

## Standard Header Information

From: "Chris Brekka" <cbrekka@worldnet.att.net>
To: <Cbrekka@att.net>
Subject: Fw: Fountain Ridge Web Stats
Date: Tue, 3 Jun 2003 17:50:28 -0400
MIME-Version: 1.0
Content-Type: multipart/alternative;
 boundary="----=_NextPart_000_0019_01C329F8.9EBC61C0"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 6.00.2800.1158
X-MimeOLE: Produced By Microsoft MimeOLE V6.00.2800.1165

1    mean nobody used it but it was functional?

2         A    Correct.

3         Q    Okay.  So it just sat somewhere?

4         A    In a case.

5         Q    Okay.  Did you take over -- did Chris

6    Brekka have an office while he was there?

7         A    Yes.

8         Q    Did you take over his office?

9         A    Yes, I did.

10        Q    And was the computer in that office?

11        A    Yes, it was.

12        Q    But you never touched -- I mean, you never

13   put it on and did anything on it?

14        A    I don't believe so.  I was given a

15   computer the first day I started.  I used my own.

16        Q    Did you have any instructions not to touch

17   that computer?

18        A    I don't recall being instructed not to

19   touch it.

20        Q    Okay.  If Mr. Smith had told you not to

21   touch it, I take it you would remember that?

22        A    I probably would remember that.

23        Q    Okay.  Do you recall where in that office

24   the computer was?

25        A    I don't.

```
1        Q    And what was done with the computer that
2   Chris Brekka left when he left LVRC?
3              He did leave the computer; correct?
4        A    Yes.
5        Q    All right.  And did you take over that
6   computer?
7        A    I did not.
8        Q    Who did?
9        A    I don't remember who the employees were.
10       Q    More than one used that computer?
11       A    I believe there was more than -- that we
12  had identified more -- that two had used it after
13  Chris.
14       Q    And can you remember the names of those
15  two people at this time?
16       A    I believe George Gatski was one of them.
17       Q    And who else?
18       A    I can't recall the first one.
19            MR. KIRSHMAN:  Why don't we take another
20  two minutes and you think about it.
21            THE WITNESS:  Okay.
22                (Recess taken.)
23            MR. KIRSHMAN:  Back on the record.
24       Q    (BY MR. KIRSHMAN)  Mr. Greenstein --
25       A    Yes.
```

```
 1          Q    -- do you recall the other person?
 2          A    Yes.  Heather, I believe her last name was
 3     Huddleston.  I don't want to be held to the last
 4     name.
 5          Q    Okay.  And the first name is?
 6          A    Heather.
 7          Q    And the other person that you mentioned?
 8          A    George Gatski.
 9          Q    Gats?
10          A    G-a-t-s-k-i.
11          Q    And Gatski.  Okay.
12          A    Yes.
13          Q    What job did George do?
14          A    George is a counselor.
15          Q    Okay.  And a counselor is someone who
16     deals directly with the clients, slash, patients?
17          A    That's correct.
18          Q    And what about Heather?
19          A    Heather was an, I believe, administrative
20     assistant.  She did some copyrighting, some design.
21          Q    Did she report to you?
22          A    She did.
23          Q    And do you know how computer literate
24     George was at the time?
25          A    I don't believe he's very computer
```

**pcforensics**
THE POWER TO UNLOCK DATA

2202 N. Westshore Blvd.
Suite 200
Tampa, FL 33607
**Tel: (813) 639-4295**
**Fax: (813) 354-2400**
E-mail: info@pcforensics.com
Web: www.pcforensics.com

Wade Gochnour
HANEY, WOLOSON & MULLINS
1117 South Rancho Drive
Las Vegas
NV 89102

20th July 2006

Dear Mr. Gochnour,

### Re: LVRC –vs.- Brekka

Further to my expert's report, I would like to add to following supplemental information;

The recovery of emails from the laptop owned by LVRC, and formally used by Mr. Brekka was a complex process. This involved scanning the Unallocated Area (free space) of the hard drive for encoded files called DBX files. As everything in the Unallocated Area of a hard drive is considered deleted, the DBX files were recovered by searching for their unique file signature header and footers.

In essence, the Unallocated Area of the hard drive was searched for the unique data that appears at the start of a DBX file. Once this header was located, the file is copied until the unique data that appears at the end of the file is located; - This is known as unique file footer.

For clarification purposes, a DBX file is an encoded file, created automatically when using Outlook Express to send and receive email. This file is not viewable without either Outlook Express installed, or by processing with specialized tools. On this occasion, emails were recovered by processing the recovered DBX files with specialized non invasive computer forensic tools.

The emails recovered from the DBX files would not have been available for anyone else to view, without going through the process that is described above. In addition, for anyone to actually go through this process and be successful in the recovery of DBX encoded emails would have required additional specialized knowledge and training.

Sincerely,

David Greetham          Offices located in the United States and the United Kingdom.

```
 1              If this was sent and received by Chris
 2   Brekka at the computer that he used --
 3        A.   Uh-huh.
 4        Q.   -- while employed at LVRC, does that
 5   indicate that anybody at LVRC who had access to
 6   Chris Brekka's e-mails, either in the database
 7   or downloaded, would have the login
 8   information?
 9        A.   Well, based off this, I would say that
10   if -- if Chris was checking his ATT.net mail at
11   work and he had this set up on his work
12   computer and he did not delete this and remove
13   it after he left and someone was using that
14   computer, then, yeah, they would have access to
15   that.
16        Q.   Let me indulge you again for a short
17   -- these short breaks shorten the depositions.
18        A.   Sure.
19             (Recess taken)
20   BY MR. KIRSHMAN:
21        Q.   Well, while you're looking, there's
22   just a couple of clean-up questions.
23             During the period -- during the
24   period, say, from September 2003 to November
25   2004, what was -- what was the manner in which
```

Page 199

```
1              (Exhibit 27 marked)
2    BY MR. GOCHNOUR:
3       Q.   Mr. Brekka, I'm showing you a document
4    marked as Exhibit 27.
5       A.   Yes.
6       Q.   It's entitled, Daily Update Meeting
7    September 2, 2003.
8       A.   Yes.
9       Q.   Again, I'll represent to you that this
10   document came from your home computers.
11           Were you commonly copied on daily update
12   meetings?
13      A.   Absolutely.
14      Q.   For what reason?
15      A.   Wanted to know what was going on, as far
16   as updates with admissions and discharges.
17      Q.   And, again, September 2, 2003, were you
18   still employed at LVRC at that time?
19      A.   I believe I was.
20      Q.   Do you know, at that time, whether you
21   were considering leaving LVRC?
22      A.   I do not.
23      Q.   Do you know how you obtained this
24   document?
25      A.   My guess is if I was not at LVRC, it was
```

Page 200

```
1    emailed to me by Tom Cook.
2       Q.   And you were not an attendee at this
3    particular meeting?
4       A.   It doesn't look like I was.  Does it say
5    Chris -- I was not.
6       Q.   Has attendees up at the top.
7       A.   Correct.  I was not.
8       Q.   And then the individual names that are
9    listed down on the left-hand side, what do those
10   represent?
11      A.   Potential -- either potential clients that
12   were in-house on the top, and pending clients that
13   were pending admission.
14           (Exhibit 28 marked)
15   BY MR. GOCHNOUR:
16      Q.   And, again, Mr. Brekka, I'm showing you a
17   document that's been marked as Exhibit 28.
18           Do you recognize this document?
19      A.   Yes.
20      Q.   I'll again represent to you that this
21   document was recovered from your home computer and
22   it's a daily update meeting dated September 15,
23   2003?
24      A.   Correct.
25      Q.   Do you know if this was still at the time
```

Page 201

```
1    in which you were employed with LVRC?
2       A.   I believe I still was.
3       Q.   As of the 15th, you believe you were still
4    employed?
5       A.   I guess so.
6       Q.   Do you know the date when you actually
7    terminated?
8       A.   I do not recall off the top of my head.
9    And the reason why I say I was still employed,
10   because one of the notes on the pending admission
11   says, "Chris is working on this one."
12      Q.   Let me ask you this question.  In
13   relationship to your departure, do you know when
14   Mr. Greenstein started full-time employment?
15      A.   I believe in September of 2003.
16      Q.   At his deposition, and, again, if I
17   misstate it, I'm sure we can find the deposition and
18   get it totally correct, but as I understood it
19   generally, Mr. Greenstein started the first working
20   day of the week.  And the second or third day he was
21   there, you came to him and told him you were
22   leaving.  Does that sound accurate?
23      A.   Correct.
24      Q.   And then, by the end of that week you had
25   left LVRC?
```

Page 202

```
1       A.   I believe so.
2       Q.   So if we can determine when Mr. Greenstein
3    started full-time employment, that would give us an
4    accurate date of when you left?
5       A.   You can do that, yes.
6            (Exhibit 29 marked)
7    BY MR. GOCHNOUR:
8       Q.   Mr. Brekka, I'm showing you what's been
9    marked as Exhibit 29.
10           And this looks like a broken out
11   spreadsheet; correct?
12      A.   Correct.
13      Q.   And do you recognize the title on the
14   first page?
15      A.   I do.
16      Q.   And it was 2003 EBS, Inc. Referrals to
17   Providers?
18      A.   Correct.
19      Q.   And we can kind of put this together by
20   looking at the column letters and the numbers on the
21   side?
22      A.   Yes.
23      Q.   So I don't have, apparently, columns A and
24   B for lines 1 through 55.  Does that look right?
25      A.   Apparently, you do not.
```

LITIGATION SERVICES & TECHNOLOGIES

1        A     Yes.

2        Q     Were there conversations with any degree

3    of frequency, like once a week, once every two weeks,

4    once a month?

5        A     There were a lot of conversations but at

6    no regular frequency.

7        Q     When you say there were a lot, we're

8    talking about approximately 14 months between

9    September 2003 and -- what was it?  November 2004?

10   Okay.

11              During that period of time, can you

12   estimate how many conversations there were?

13       A     Fifty.

14       Q     Fifty.  Okay.

15              And are you able to tell us with any

16   degree of accuracy what the subject matter of those

17   conversations were?

18       A     Broadly, they related to adjustments to

19   our Web site and making changes to our e-mail

20   accounts.  Adding a new e-mail for a new employee or

21   deleting an e-mail account for a former employee or

22   resetting a password or just standard -- I suppose

23   standard --

24       Q     When you say resetting a password, was

25   that only e-mail passwords?

1    don't know everything that he logged in.  It

2    just happened to be that when I was logged in

3    that day -- I usually don't handle support, but

4    that time of day, I was, and I saw the login.

5    I saw things they were asking.

6         To be honest, I thought it was someone

7    at LVRC wanted to know if I could help them

8    before they, to be perfectly honest, started

9    deleting accounts and then called me and said,

10   "I don't know what happened to my mail," and I

11   had to fix it.

12        Q.  When you saw the login --

13        A.  Yes.

14        Q.  When you saw the login -- and assume

15   pretty accurately that I am not terribly good

16   in this --

17        A.  Sure.

18        Q.  -- in the jargon, what is the "login"?

19        A.  The login is the e-mail address.  The

20   e-mail -- the login that was in at that time,

21   the person that logged in used

22   cbrekka@FountainRidge.com.

23        So what I saw on the system was

24   cbrekka@FountainRidge.com logged into our admin

25   system.

1    had access to information -- he just had access

2    to his account that most people didn't have

3    access to.  Like they're allowed or authorized

4    to have it, but they just didn't know what they

5    were doing.

6         So but I felt -- I remember meeting

7    with Mr. Brekka, and he seemed internet savvy,

8    so we gave him access.

9         Q.  But to your knowledge, at that time,

10   November 19, he was -- that address that he

11   had --

12        A.  Right.

13        Q.  -- was the -- that Chris Brekka was

14   the only one who had access to that?

15        A.  Correct.  To my knowledge, yes.

16        Q.  Okay.  Did you notice what he was

17   looking for, what information he was looking

18   for, when -- he or it or whatever?

19        A.  I did not -- I don't recall seeing

20   exactly what he was looking at.  I do recall

21   seeing like access to pages of the admin.  But

22   the way the system works is there's a delay,

23   and then certain areas that are authorized,

24   they block, they get timed out.

25        So without getting extremely technical

1    on how this Live Person software works, it

2    tracks users to the system.  It's more of a

3    support program.

4         It's good, because I'm able to

5    identify clients or past visitors and maybe

6    sell them.  If they are a client, I'm able to

7    see if they're logged in and if they're

8    breaking things, honestly, or if they know what

9    they're doing.  And then that way, I can offer

10   them support.

11        Q.  At that time, November 19, 2004, was

12   there anyone else besides Chris Brekka who had

13   had access to that login?

14        A.  Not that I'm aware of.  I'd say no.

15        Q.  Okay.  But I take it it was your

16   belief that since Chris Brekka hadn't been

17   employed by LVRC for some time before

18   November 19 --

19        A.  Right.

20        Q.  -- that something was amiss?

21        A.  Yes.  To be honest, most of our

22   clients, they leave a -- they leave access to a

23   login.  I thought maybe he left it for Brad to

24   access the system.

25        Q.  You don't know one way or the other,

ALL-AMERICAN COURT REPORTERS (702) 240-4393

1    A.  Uh-huh.

2    Q.  What were you telling Brad Greenstein?

3    A.  Basically, what I was telling Brad was

4    if you're concerned about -- well, what I was

5    mostly concerned about was e-mail information.

6    If you don't want someone accessing the

7    account, we should change the password.

8         And whoever was logging in as

9    cbrekka@FountainRidge.com, the information

10   hadn't been changed.

11   Q.  Now, your system -- your system to

12   identify what -- well, you tell me --

13   A.  Okay.

14   Q.  -- what did your system do for you

15   that put a red light in your mind about what

16   you saw on November 19?

17   A.  Okay.  I just want to clarify

18   something real quick.  Are we talking about our

19   system as our e-mail system or the Live Person

20   system that helped me track --

21   Q.  Well, let me --

22   A.  -- like for Exhibit B?

23   Q.  -- refer you to Brad Greenstein's

24   affidavit.  On the second page, I think it's

25   Line 16.

1        A.   Oh, yeah.   Okay.   That's the Live

2    Person program.   That's a third-party program

3    that we use.

4        Q.   And did -- did that program enable you

5    to know who, like a person, what person was

6    logging in using that password?

7        A.   It will not tell me what person.   It

8    will tell me what login ID accessed the system

9    and what IP address they accessed it from.

10       Q.   So for example, if I -- if I had that

11   login --

12       A.   Uh-huh.

13       Q.   -- and I was the originator of that

14   request for information, you couldn't say Norm

15   Kirshman?   You would only be able to say

16   whoever's using --

17       A.   That is correct.

18       Q.   -- using it?

19       A.   Correct.

20       Q.   Okay.   If you look at Line 16, I

21   believe Brad Greenstein said that he was told,

22   or on information and belief, that the system

23   would identify who -- let me see if --

24       A.   Oh, I see what you're saying.   It

25   says, "allowed them to determine who was on the

1    system at any time."

2         Q.  Is that accurate?

3         A.  It won't tell them exactly who.  The

4    most accurate statement is it will tell you the

5    login ID accessing the system.  It will tell

6    you the IP address, which is the, you know,

7    internet address location where that session is

8    taking place from.

9         Q.  Okay.  So the IP address, in this

10   case, would that have been San Francisco

11   somewhere?

12        A.  I don't know.  I know that -- now, I

13   know that back then and today, you can track an

14   IP address.  That's how the FBI tracks spammers

15   and things like that to a specific residence

16   per se or how they can trace a virus to a

17   specific location.

18            So the IP address tends to be fairly

19   accurate, but there's still some work that

20   needs to go into it, I'm assuming.  I'm not an

21   expert in that area.

22        Q.  How long -- how long did Load have

23   that capability?  Well, let me just ask you

24   this:  When did Load first begin to provide

25   services to LVRC?

1       A.   The login -- I'm sorry -- that we

2    still had an old address being used.  At that

3    time, I called and said -- actually, I think my

4    first statement was, "I see you're in the

5    system.  Do you want me to change your login?"

6             I was kind of laughing about it, at

7    which point I got a, "What are you talking

8    about?"

9       Q.   When you made that statement, "It

10   looks as though you're in the system," was it

11   your belief that Brad Greenstein had the login

12   that was in place while Chris Brekka was

13   employed at LVRC?

14      A.   I believed someone was logging in, and

15   I just thought the information was old.  I

16   don't -- I don't know who logged in, I guess,

17   is my point.  It could have been -- I would be

18   speculating on that.

19      Q.   Well, did you have any belief that

20   anybody besides Chris Brekka -- anybody who was

21   employed in November, November 19, 2003, had

22   the login?

23      A.   It is -- I can tell you the reason I

24   called him was because I thought someone at

25   their company must have had access to it,

1    because I did not think in -- in my estimation,

2    we had not had clients logging in after the

3    fact.  So I thought someone must have been

4    accessing using that user name and password.

5         Q.  Okay.

6         A.  You know, I called because Brad was my

7    point of contact.  Does that mean I thought it

8    was him?  Not necessarily.  I just saw that

9    someone was logged in.

10        Q.  So just so I hopefully understand it,

11   just logging into the system --

12        A.  Uh-huh.

13        Q   -- through the use of this

14   administrative code -- is that the right

15   terminology?

16        A.  Yeah.  I mean, it's an admin user name

17   and password.

18        Q.  Okay.  Just logging in, without going

19   further, would not give whoever it was the

20   content of any e-mails?  Is that a correct

21   statement?

22        A.  That's correct.

23        Q.  Okay.  That person or persons would

24   have to take it one step further and get the

25   password for a given e-mail address?

1       A.  No.

2       Q.  No?  Okay.  And he wouldn't be able to

3   find out from that computer what the password

4   was?

5       A.  No.

6       Q.  Okay.

7       A.  At least, they better not, or we're in

8   trouble.

9       Q.  Well, they couldn't do it if you were

10  the barrier; right?

11      A.  Correct.

12      Q.  On Exhibit B, like the third paragraph

13  from the bottom --

14      A.  Okay.

15      Q.  -- there are uppercase letters --

16      A.  Uh-huh.

17      Q.  -- like C-E-R-T --

18      A.  CERTnet, NETBLK, CERFnet --

19      Q.  Right.  Can you translate those into

20  simple English for me?

21      A.  Sure.  Basically, what that is saying

22  is that the IP in question, which I identified

23  as 199.107.156.30 --

24      Q.  Did you ever find out where that was?

25      A.  Yeah.  Right below -- well, I did not

ALL-AMERICAN COURT REPORTERS (702) 240-4393

1          Q.  And did that administrative code

2     system enable him to have -- well, what was the

3     scope of access that he would have to LVRC

4     data?

5          A.  Okay.  His login, which is what we're

6     talking about now, is exactly what you would be

7     seeing in Exhibit B.  So what we're talking

8     about now is exactly that.  He would have

9     access to whatever was set up on our system,

10    which I think at the time was e-mail statistics

11    and DNS.  DNS would be the server settings and

12    mail settings.  Statistics would be web

13    traffic.  And e-mail is e-mail.

14         Q.  And he could get into anybody's

15    e-mail?

16         A.  Yes.

17         Q.  So that system was in place --

18         A.  Actually, let me rephrase that.

19         Q.  Sure.

20         A.  He could see any person's e-mail

21    address and password, but he could not read

22    their mail from there.

23         Q.  He could not?

24         A.  Correct.  That's a more accurate

25    statement.

1    system at any time."

2        Q.  Is that accurate?

3        A.  It won't tell them exactly who.  The

4    most accurate statement is it will tell you the

5    login ID accessing the system.  It will tell

6    you the IP address, which is the, you know,

7    internet address location where that session is

8    taking place from.

9        Q.  Okay.  So the IP address, in this

10   case, would that have been San Francisco

11   somewhere?

12       A.  I don't know.  I know that -- now, I

13   know that back then and today, you can track an

14   IP address.  That's how the FBI tracks spammers

15   and things like that to a specific residence

16   per se or how they can trace a virus to a

17   specific location.

18          So the IP address tends to be fairly

19   accurate, but there's still some work that

20   needs to go into it, I'm assuming.  I'm not an

21   expert in that area.

22       Q.  How long -- how long did Load have

23   that capability?  Well, let me just ask you

24   this:  When did Load first begin to provide

25   services to LVRC?

```
1        A.  No.

2        Q.  No?  Okay.  And he wouldn't be able to

3   find out from that computer what the password

4   was?

5        A.  No.

6        Q.  Okay.

7        A.  At least, they better not, or we're in

8   trouble.

9        Q.  Well, they couldn't do it if you were

10  the barrier; right?

11       A.  Correct.

12       Q.  On Exhibit B, like the third paragraph

13  from the bottom --

14       A.  Okay.

15       Q.  -- there are uppercase letters --

16       A.  Uh-huh.

17       Q.  -- like C-E-R-T --

18       A.  CERTnet, NETBLK, CERFnet --

19       Q.  Right.  Can you translate those into

20  simple English for me?

21       A.  Sure.  Basically, what that is saying

22  is that the IP in question, which I identified

23  as 199.107.156.30 --

24       Q.  Did you ever find out where that was?

25       A.  Yeah.  Right below -- well, I did not
```

1    know where it was.  I do know that the

2    provider, which ARIN identified as being

3    CERTnet, using a NETBLK and a C Class, a sub

4    C Class of 199.105, basically, what it means is

5    that IP address fell within that range of that

6    provider.  That provider would have a much

7    greater likelihood of identifying where that IP

8    address came from.

9        Q.  Have you ever been asked by anybody at

10   LVRC to take that next step?

11       A.  No.

12       Q.  Now, Redwood City is -- I recognize

13   that.  Is that the location of the provider?

14       A.  I don't know.  I know typically, it

15   comes back, and if you run a lookup, it will

16   provide information like that.  It could be

17   Redwood City anywhere.  But typically, when

18   that information gets kicked back, that's what

19   the internet registry reports back.  So I just

20   copied that information and pasted it in.

21       Q.  And if I were -- not me, God forbid --

22   but if Lynn or Leon here wanted to take that

23   next step, is this information adequate for

24   them to do it based upon what's typed out

25   there?

1        A.   It's a good start to know where to

2    look.  Absolutely.

3        Q.   And it was -- it was -- I see the

4    next-to-the-last paragraph on Exhibit B, it

5    says, "Brad instructed me" -- quote, "Brad

6    instructed me to deactivate the login

7    information for cbrekka@FountainRidge.com" --

8        A.   Uh-huh.

9        Q.   -- "at which time I changed the

10   password associated with the account so that

11   the login could not access the system."

12       A.   Uh-huh.

13       Q.   So would it be reasonably accurate

14   that on or about November 19, 2004, the

15   chrisbrekka@FountainRidge.com login was

16   deactivated?

17       A.   Based off -- I mean, I don't recall

18   exactly.  But based off what I wrote, I'd say

19   yeah.

20       Q.   Your records would show that?

21       A.   No.  I went directly into a database

22   and did what is called a hard code change, so

23   it's not logged, the reason being is our system

24   was probably not well enough developed to

25   change passwords via a web page, so I had to go

Expert report of        David Greetham        6
Case 2:05-cv-01026-KJD-GWF Document 47-2   Filed 09/01/06   Page 33 of 48
On behalf of        Haney, Woloson & Mullins

3.9    The hard drive was manufactured by Toshiba, and was model no. MK6021Gas s/n. 23LB2727T – A chain of custody was created, and a forensically sound image of the hard drive was created at my business premises on 20th October 2005.

3.10   On 26th October 2005, I began my investigation into the hard drive provided to me by Stuart Smith. I noted that the computer hard drive had been used recently, which was expected, as I had been advised that the computer had been redeployed since the termination of Brekka's employment with LVRC.

3.11   I performed a forensically sound process to recover deleted files from this hard drive. Deleted files are never truly deleted until the area of the hard drive that they occupy is actually overwritten with new data. (A more detailed description of recovering deleted files can be found at the end of this report in appendix 2). – In particular, I searched for evidence of deleted email.

3.12   I discovered a small DBX file, which is known to me to be used for the storage of email using **Microsoft Outlook Express** software. I processed this DBX file and noted many emails involving Christopher Brekka, using the email of addresses cbrekka@aol.com cbrekka@att.net and cbrekka@fountainridge.com – During this timeframe, cbrekka@fountainridge.com was the business email used by Brekka while working for LVRC

3.13   During my review of these emails, I noticed that Brekka had sent business records from his business email address to his personal email address (and to Carolyn Quain) within a few days prior to his departure from LVRC. – These emails included attachments such as contract details, client information and formal agreements. On 29th August 2005 alone, eleven (11) documents were forwarded to Brekka's personal email addresses. These attachments appear to be private company records.

3.14   I collated my findings and passed these results to Wade Gochnour for review.

3.15   On 15th December 2005 I attended the offices of the U.S. Marshals in Las Vegas, NV. I was met by Steven Carpenter and Christopher Brekka. The purpose of this meeting was to make duplicates of the forensic images currently being held by the U.S. Marshals office. I proceeded to make a duplicate for Brekka and a duplicate for my own use. The original data was retained by the U.S. Marshals office.

3.16   I started a chain of custody documentation for my copy of the images, and placed the duplicates in our data safe, at our business premises.

3.17   In mid January 2006, I began investigating the images DAG-001 through DAG-005

3.18   I noted that the emails previously mentioned in section 3.13 of this report, were located on one of the hard drive images duplicated on 15th December 2005 - I also noted that these emails had been opened and read, with the attachments downloaded.

3.19   During my review of these duplicates, I recovered the deleted Internet History from the hard drive images. When a computer accesses the Internet, a temporary copy of the

Expert report of David Greetham
Specialist field: Computer Forensics
On behalf of: Hand, Arendall & Mirfas

Case 2:05-cv-01026-KJD-GWF  Document 47-2  Filed 09/01/06  Page 34 of 48

## 4    My opinion

It is my professional opinion that Christopher Brekka (or the user of his computers) has taken without authority, private business records from LVRC. These private business records equate to the intellectual property of LVRC. – Sections 3.13 & 3.18 of this report evidence this.

In addition, section 3.20 & 3.21 of this report demonstrate that the user of the Brekka computer has gained unauthorised access to confidential business records in the form of web site statistics. As Brekka left LVRC in September 2003, there is no plausible reason for Brekka (or the user of his computer) should have access to this confidential information.

Furthermore, section 3.23 of this report indicates that the preservation order that was served on Brekka 25th August 2005 was not adhered to, and the actions in relation to the system restore point may have deleted and made unrecoverable, electronic files from the computer system labelled DAG-001

I address the issues raised in section 2 of this report as follows;

> a) Is there any evidence that private company records and intellectual property was taken from the LVRC computer systems?

There is evidence that files were electronically transmitted from LVRC using email during late August 2003

> b) Is there any evidence that Christopher Brekka copied private company records directly prior to him leaving the employment of LVRC in September 2003?

There is evidence to support the allegation that Brekka stole private company records from LVRC, directly prior to the termination of his employment in September 2003. This is evidenced in several areas and most conclusively when he sends emails to himself and his wife Carolyn Quain, with private company records as attachments.

> c) Is there any evidence to suggest that Christopher Brekka has gained access to the LVRC computer systems, after he left the organization in September 2003?

I did not investigate the computer network at LVRC, and therefore am unable to ascertain if any unauthorized access was gained at this time. However, it is evident that unauthorised access to the LOAD system was obtained by the Brekka computers labelled DAG-001 & DAG-002 as recently as 9/2005. The information that was accessed at this point contained private company records

*Privileged & Confidential*

LVRC00177

Brad Greenstein

From:      Nick Jones [nick@load.com]
Sent:      Friday, November 19, 2004 3:56 PM
To:        'Brad Greenstein'
Subject:   Unauthorized Login

Brad,

Per our conversation, I have outlined the series of events that occurred on Friday, November 19, 2004 at approximately 3:30PM PST

An individual using the login ID cbrekka@fountainridge.com logged into the Load Admin system. The e-mail account was directly linked to the Las Vegas Recovery/Fountain Ridge account which managed the e-mail system, web statistics, and DNS for various domain names.

I was notified of this peculiar activity on our system because of a service that we subscribe to called Live Person, which allows me to track users on our site and which products they are viewing. When I noticed the login cbrekk@fountainridge.com logged into the Admin system, I immediately called Las Vegas Recovery and check with Brad Greenstein that no user on the staff was logged in under the given account login

I notified Mr. Greenstein that the IP Address being used during the user session was 199.107.156.30

According to ARIN, the IP address belonged to

The individual who was logged into the Admin system viewed the LoadMail accounts, LoadStats system as well as the rest of the Account information. No modifications were made to the data on file.

The IP Address used during the login session was 199.107.156.30 which ARIN identified belonging to.

CERTnet NETBLK-CERFNET-CBLK2 (NET-199-105-0-0-1) 199.105.0.0 - 199.108.255.255   AND
STSN - Redwood City NETBLK-ATTENS-008027 (NET-199-107-152-0-1) 199.107 152.0 - 199.107.169.255

Brad instructed me to deactivate the login information for cbrekka@fountainridge.com at which time I changed the password associated with the account so that the login could not access the system.

If there is anything more that I can do to assist Las Vegas Recovery, please do not hesitate to let me know.

Regards,
Nick Jones

11/22/2004


Exh. B  Date 7/12/04
Witness N. Jones
Kerrie Keller CCR 612

LVRC00224

1      A.  It's a good start to know where to

2   look.  Absolutely.

3      Q.  And it was -- it was -- I see the

4   next-to-the-last paragraph on Exhibit B, it

5   says, "Brad instructed me" -- quote, "Brad

6   instructed me to deactivate the login

7   information for cbrekka@FountainRidge.com" --

8      A.  Uh-huh.

9      Q.  -- "at which time I changed the

10  password associated with the account so that

11  the login could not access the system."

12     A.  Uh-huh.

13     Q.  So would it be reasonably accurate

14  that on or about November 19, 2004, the

15  chrisbrekka@FountainRidge.com login was

16  deactivated?

17     A.  Based off -- I mean, I don't recall

18  exactly.  But based off what I wrote, I'd say

19  yeah.

20     Q.  Your records would show that?

21     A.  No.  I went directly into a database

22  and did what is called a hard code change, so

23  it's not logged, the reason being is our system

24  was probably not well enough developed to

25  change passwords via a web page, so I had to go

Page 3

```
                    I N D E X
WITNESS:   CHRISTOPHER BREKKA

EXAMINATION                              PAGE

By Mr. Gochnour                            6


               E X H I B I T S

NUMBER                                   PAGE

  1      Website Page                      30

  2      Resume of Christopher Brekka      77

  3      Treatment Resources Web Page     114

  4      Notice                           125

  5      LOAD Stats Email Report          129

  6      Email                            134

  7      Email                            138

  8      July 24, 2003 Key Word Approval  140

  9      Email to Nick Jones              142

 10      Email                            147

 11      Email Message 0028               152

 12      Computer Records                 160

 13      Email                            164

 14      August 29, 2003 Email            166

 15      LVRC Marketing Budget            168

 16      Domain Names Document            173

 17      July 19, 2006 Document           174
```

Page 4

```
                E X H I B I T S
CONTINUED...

 18      Internet Advertising Printout    179

 19      Emails                           183

 20      July 19, 2004 Email              184

 21      Email                            187

 22      End-of-the-road Business Plan    189

 23      Email                            191

 24      Atlantic Shores Document         193

 25      August 25, 2005 Document         196

 26      Balance Sheet Comparison         197

 27      Daily Update Meeting             199

 28      Daily Update Meeting             200

 29      Broken Out Spreadsheet           202

 30      Answer and Third-Party Complaint 208

 31      Internet History                 225
```

Page 5

```
 1          LAS VEGAS, NEVADA, FRIDAY, JULY 21, 2006;
 2                        9:12 A.M.
 3                         -oOo-
 4
 5          (Whereupon, the parties agreed to waive
 6
           the reporter's duties under NRCP Rule
 7
           30(b)(4).)
 8
                THE VIDEOGRAPHER:  This is the beginning
 9   of videotape number one, deposition of Christopher
10   Brekka, in the matter of LVRC Holdings versus
11   Brekka, held at 1117 South Rancho Drive on July
12   21st, 2006, at 9:11 a.m.  The court reporter is Kim
13   Farkas.  I am Dustin Kittleson, the videographer, an
14   employee of Litigation Services & Technologies,
15   located at 1640 West Alta Drive, Las Vegas, Nevada,
16   89106.  This deposition is being videotaped at all
17   times unless specified to go off the video record.
18          Would all present please identify
19   themselves beginning with the witness.
20          THE WITNESS:  Christopher James Brekka.
21          MR. GOCHNOUR:  Wade Gochnour, on behalf of
22   Plaintiffs and Third-party Defendant Stuart Smith.
23          MR. KIRSHMAN:  Norman Kirshman of Parsons
24   Behle & Latimer, on behalf of the Defendants and
25   particularly today representing the deponent.
```

Page 6

```
 1          MR. GOCHNOUR:  Do you need anything else,
 2   Mr. Videographer?
 3          THE VIDEOGRAPHER:  No.
 4          MR. GOCHNOUR:  Would you swear the witness
 5   in.
 6               CHRISTOPHER BREKKA,
 7   was called as a witness, and having been first duly
 8   sworn, was examined and testified as follows:
 9
10                    EXAMINATION
11   BY MR. GOCHNOUR:
12       Q.    Good morning.  Can you please state your
13   name and spell your last name for the record.
14       A.    Christopher James Brekka, B-R-E-K-K-A.
15       Q.    And, Mr. Brekka, at any time after you
16   left employment with LVRC, did you access the LOAD
17   account on behalf of LVRC?
18       A.    No.
19       Q.    Have you ever had your deposition taken
20   before?
21       A.    No.
22       Q.    Okay.  You've sat through several
23   depositions in this case; correct?
24       A.    Yes.
25
```

3 (Pages 3 to 6)

1           MR. KIRSHMAN: Are we going to get it?

2           MR. GOCHNOUR: We're not going to rely on

3   any loss set forth in the financial statements as a

4   basis for our damages. We've used this information

5   and it's gone to the expert in just that exact same

6   form. You're getting exactly what he's getting to

7   come up with the damages.

8           MR. KIRSHMAN: And the damages are not

9   going to be based on the performance of LVRC after

10  Chris Brekka left?

11          MR. GOCHNOUR: Correct.

12          MR. KIRSHMAN: Are you going to inform us

13  of what the damages are, what components the damages

14  are going to have?

15          MR. GOCHNOUR: Yeah. It will be part of

16  the expert's report. As I understand, it's due the

17  31st. We're busy working, trying to get that all

18  together for you and put it to bed for you.

19          MR. KIRSHMAN: Can you tell me what the

20  purpose of -- what's below the redactions? If you

21  don't want us to know specifically, what categories

22  of information are redacted? It's pretty odd for me

23  to look at something like this and know what is not

24  being shown.

25          MR. GOCHNOUR: It's probably, what, vendor

experience. I have reviewed and relied upon a number of documents, which are listed in Tab 3. In support of my opinions, I may use at trial the exhibits and information listed in this disclosure as well as other exhibits or demonstrative aids made or derived from the exhibits or information listed in this disclosure, or other materials obtained in discovery or otherwise in this action.

7. It is my understanding that discovery is still outstanding. If additional documents or other information becomes available or comes to my attention, I may have additional comments and may revise or supplement my opinion. I am aware of my continuing obligation under Rule 26 to supplement this report as, and if, additional information becomes available.

## IV. Conclusions

8. The loss incurred by LVRC as a result of the actions of the defendants is $1,143,898. I am awaiting receipt of EBS financial statements to determine unjust enrichment earned by EBS as a result of the actions of the defendants and may update or revise my report should these or other documents come to my attention.

## V. Statement of Opinions and Reasons and Bases Therefor

### Background

9. LVRC operates Las Vegas Recovery Center, a private, freestanding, medically managed inpatient detoxification and substance abuse center in Las Vegas.[1] EBS is in the business of providing Employee Assistance Programs (EAP) to companies for the benefit of employees and their family members.[2] EBS also obtains potential referrals for addiction rehabilitation services, and provides referrals of potential patients to rehabilitation facilities through the use of internet sites and advertisements.[3] EBS also provides consulting and business development including internet marketing.[4]

---

[1] www.lasvegasrecoverycenter.com
[2] www.ebs-eap.com
[3] Complaint, para. 12.
[4] Deposition of Christopher Brekka on July 24, 2006.

3

10. I am informed that Mr. Brekka was employed by LVRC from April 2003 through September 2003, and had unauthorized access to LVRC's system through November 19, 2004.

11. According to the Uniform Trades Secrets Act, Section 3, if the defendant is found liable, the plaintiff is entitled to recover damages for misappropriation of trade secrets:

> "Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret."

## LVRC's Loss

12. I reviewed financial information provided by LVRC and computed the expenses incurred by LVRC in designing and developing its website, generating keywords for webpage optimization, and utilizing the internet to market LVRC's services to potential clients. It is my understanding that each of these areas of expense was compromised by the actions of Mr. Brekka.

13. I reviewed the expenses for the time period from Mr. Brekka's initial involvement with LVRC, March of 2003[5], through November 19, 2004, the last date he had access to LVRC's system. I also reviewed expenses incurred by LVRC from November 20, 2004 through August 22, 2005, since Mr. Brekka's prior involvement continued to comprise the effectiveness of LVRC's online marketing.

14. I then reviewed the hours spent by LVRC employees and contractors in internet and non internet marketing activities. Based on my years of experience, conversations with company officers, and information provided by LVRC, I calculated the expense incurred by LVRC in internet marketing activities compromised by Mr. Brekka's actions.

---

[5] I examined an expense report from Mr. Brekka that included expenses from March 24, 2003.

LVRC Holdings v. Brekka
Advertising Expense Losses
April 1, 2003 through August 22, 2005

Schedule 2

| | 4/1/03 - 9/3/03 | 9/4/03 - 12/31/03 | 1/1/04 - 11/19/04 | Total for 9/4/03 - 11/19/04 | 11/20/04 - 12/31/04 | 1/1/05 - 8/22/05 | Total for 11/20/04 - 8/22/05 | Total Advertising |
|---|---|---|---|---|---|---|---|---|
| **Online Internet Advertising** | | | | | | | | |
| Online Marketing | $ 743 | $ 8,591 | $ 68,299 | $ 76,890 | $ 13,491 | $ 46,825 | $ 60,316 | $ 137,949 |
| Web Page Design | 2,725 | 60 | - | 60 | - | - | - | 2,785 |
| E-mail Marketing | - | - | 60 | 60 | 410 | 1,125 | 1,535 | 1,595 |
| Marketing Contract Labor (a) | - | - | 24,439 | 24,439 | 4,500 | - | 4,500 | 28,939 |
| Other (b) | - | - | - | - | 1,151 | - | 1,151 | 1,151 |
| **Total Online Internet Advertising** | 3,468 | 8,651 | 92,798 | 101,449 | 19,552 | 47,950 | 67,502 | 172,419 |
| 50% of Online Internet Advertising (c) | - | - | . | - | - | - | 33,751 | 33,751 |
| **Total Online Internet Advertising Losses** | 3,468 | 8,651 | 92,798 | 101,449 | 19,552 | 47,950 | 33,751 | 138,668 |
| **Other Advertising** | | | | | | | | |
| Print Advertising | 426 | - | 12,719 | 12,719 | 2,848 | 120,097 | 122,945 | 136,090 |
| Conference Expense | - | 850 | 7,309 | 8,159 | - | 3,810 | 3,810 | 11,969 |
| Marketing Contract Labor (d) | - | 10,500 | 1,406 | 11,906 | - | 22,405 | 22,405 | 34,311 |
| Other Advertising Expense | - | 116 | 5,699 | 5,815 | 2,510 | 944 | 3,454 | 9,269 |
| Merchandise Marketing | - | - | 33,038 | 33,038 | - | 4,445 | 4,445 | 37,483 |
| Open House Promotions | - | - | 2,775 | 2,775 | - | 2,941 | 2,941 | 5,716 |
| Salaries & Wages, Inc. Payroll Taxes | - | - | 45,339 | 45,339 | 7,552 | - | 7,552 | 52,891 |
| Advertising - Other | - | - | 2,320 | 2,320 | 2,320 | - | 2,320 | 4,640 |
| Conference Sponsoring Fees | - | - | - | - | 1,000 | 2,650 | 3,650 | 3,650 |
| Radio Marketing | - | - | - | - | - | 62,300 | 62,300 | 62,300 |
| TV Marketing | - | - | - | - | - | 176,042 | 176,042 | 176,042 |
| **Total Other Advertising Losses** | 426 | 11,466 | 110,605 | 122,071 | 16,230 | 395,634 | 411,864 | 534,361 |
| **Total Advertising Expense** | 3,894 | 20,117 | 203,403 | 223,520 | 35,782 | 443,584 | 479,366 | 706,780 |
| 50% of Total Other Advertising Expense (e) | 213 | 5,733 | 55,303 | 61,036 | 8,115 | 197,817 | 205,932 | 267,181 |
| **Total Advertising Losses** | $ 3,681 | $ 14,384 | $ 148,101 | $ 162,485 | $ 27,667 | $ 245,767 | $ 239,683 | $ 405,849 |

Notes:
Obtained from the advertising expense portion of the GL provided by LVRC.
(a) Included payments to Bernie Grohsman. GL memo notations by Mr. Grohsman's name included "internet marketing" and "online marketing".
(b) Included since the memo said "Online Advertising".
(c) Assumed Brekka is using LVRC's key words after he is no longer able to access LVRC's system.
(d) All other payments not referenced in Note (a) above.
(e) Assumed 50% since all other forms of advertising includes a reference to LVRC's website.

LVRC Holdings v. Brekka
Marketing Expense Losses
April 2003 Through Present

Schedule 3

|  | Provided By LVRC | | | Calculated | | |
|---|---|---|---|---|---|---|
|  | Non-Internet Marketing Hours or $s | Internet Marketing Hours or $s | Rate | 50% of Non-Internet Marketing (c) | 100% of Internet Marketing | Marketing Expense Losses |
| **April 2003 - September 2003** | | | | | | |
|  | | | | | | |
| **Employees** | | | | | | |
| Stuart Smith (a) | 80 | 20 | $ 100.00 | $ 4,000 | $ 2,000 | $ 6,000 |
| Frank Szabo | 50 | - | 49.22 | 1,231 | | 1,231 |
| Tommie Cook | 120 | - | 25.64 | 1,538 | | 1,538 |
| Mary Baumgartner | 40 | - | 25.26 | 505 | | 505 |
| Cherry McDowell | 40 | - | 24.14 | 483 | | 483 |
| | | | | | | |
| April 2003 - September 2003 Subtotal | | | | | | 9,757 |
| | | | | | | |
| **September 2003 - November 19, 2004** | | | | | | |
| | | | | | | |
| **Employees** | | | | | | |
| Stuart Smith | 100 | 50 | 100.00 | 5,000 | 5,000 | 10,000 |
| Brad Greenstein | 268 | 40 | 54.86 | 7,351 | 2,194 | 9,546 |
| Frank Szabo | 130 | 20 | 49.22 | 3,199 | 984 | 4,184 |
| Tommie Cook | 200 | - | 25.64 | 2,564 | - | 2,564 |
| Mary Baumgartner | 25 | - | 25.26 | 316 | - | 316 |
| Cherry McDowell | 60 | - | 24.14 | 724 | - | 724 |
| Heather Huddleston | 200 | 50 | 15.98 | 1,598 | 799 | 2,397 |
| Kristine Renn | 50 | - | 26.00 | 650 | - | 650 |
| Jerry Kay Gath | 30 | 10 | 14.03 | 210 | 140 | 351 |
| Kim Bland | 40 | - | 63.79 | 1,276 | - | 1,276 |
| Melanie Aldis | 30 | - | 25.12 | 377 | - | 377 |
| Bill Pelifer | 40 | - | 19.74 | 395 | - | 395 |
| Edie Gracia | 35 | - | 17.78 | 311 | - | 311 |
| Chuck Lehman | 40 | 10 | 89.78 | 1,796 | 898 | 2,693 |
| Jeannie Lehman | 10 | - | 40.22 | 201 | - | 201 |
| Bob Jordan (full time marketing employee) (b) | | | N/A | 9,465 | 6,310 | 15,775 |
| | $ 18,929.84 | $ 6,309.95 | | | | |

Page 1 of 4

LVRC Holdings v. Brekka
Marketing Expense Losses
April 2003 Through Present

Schedule 3

| | Provided By LVRC | | | Calculated | | |
|---|---|---|---|---|---|---|
| | Non-Internet Marketing Hours or $s | Internet Marketing Hours or $s | Rate | 50% of Non-Internet Marketing (c) | 100% of Internet Marketing | Marketing Expense Losses |
| **Contractors** | | | | | | |
| Mel Pohl | 90 | 10 | 218.41 | 9,828 | 2,184 | 12,013 |
| John Lieberman (Marketing only contractor) (b) | $ 10,403.86 | $ 3,467.95 | N/A | 5,202 | 3,468 | 8,670 |
| Merrill Kaemphert (Marketing only contractor) (b) | 3,546.26 | 1,182.09 | N/A | 1,773 | 1,182 | 2,955 |
| Michael Polin (Marketing only contractor) (b) | 7,500.00 | 2,500.00 | N/A | 3,750 | 2,500 | 6,250 |
| TA Rico (Rico Media, Marketing only contractor) (b) | 24,372.00 | 8,124.00 | N/A | 12,186 | 8,124 | 20,310 |
| September 2003 - November 19, 2004 Subtotal | | | | | | 101,958 |
| **November 20, 2004 - Present** | | | | | | |
| **Employees** | | | | | | |
| Stuart Smith | 200 | 100 | 100.00 | 10,000 | 10,000 | 20,000 |
| Brad Greenstein | 365 | 75 | 54.86 | 10,012 | 4,115 | 14,126 |
| Frank Szabo | 100 | 150 | 49.22 | 2,461 | 7,383 | 9,844 |
| Tommie Cook | 200 | - | 25.64 | 2,564 | - | 2,564 |
| Kristine Renn | 150 | - | 26.00 | 1,950 | - | 1,950 |
| Jerry Kay Gath | 10 | - | 14.03 | 70 | - | 70 |
| Kim Bland | 60 | - | 63.79 | 1,914 | - | 1,914 |
| Melanie Aldis | 250 | - | 25.12 | 3,140 | - | 3,140 |
| Bill Pelffer | 50 | 50 | 19.74 | 494 | 987 | 1,481 |
| Edie Gracia | 300 | - | 17.78 | 2,667 | - | 2,667 |
| Chuck Lehman | 300 | 100 | 89.78 | 13,467 | 8,978 | 22,445 |
| Jeannie Lehman | 100 | - | 40.22 | 2,011 | - | 2,011 |
| Vincent Marfuggi | 150 | - | 19.78 | 1,484 | - | 1,484 |
| Whitney Porter | 100 | 100 | 15.51 | 776 | 1,978 | 776 |
| Dustin Koenig | 150 | - | 19.78 | 1,484 | - | 3,462 |
| Nicholas Armstrong | 100 | - | 29.25 | 1,463 | - | 1,463 |
| Sara Drzewiecki | 40 | - | 15.38 | 308 | - | 308 |

**LVRC Holdings v. Brekka**
**Marketing Expense Losses**
**April 2003 Through Present**

Schedule 3

| | Provided By LVRC | | | Calculated | | |
|---|---|---|---|---|---|---|
| | Non-Internet Marketing Hours or $s | Internet Marketing Hours or $s | Rate | 50% of Non-Internet Marketing (c) | 100% of Internet Marketing | Marketing Expense Losses |
| Tony Greco | 600 | 200 | 44.74 | 13,422 | 8,948 | 22,370 |
| Lindsey Webb | 60 | - | 18.16 | 545 | - | 545 |
| Lynette Medeiros | 40 | - | 16.61 | 332 | - | 332 |
| Mary Bohanan | 100 | - | 26.22 | 1,311 | - | 1,311 |
| Brian Nahmias | 350 | 50 | 18.48 | 3,234 | 924 | 4,158 |
| Josh Koop | 150 | - | 17.01 | 1,276 | - | 1,276 |
| Erin Phillips | 40 | - | 13.28 | 266 | - | 266 |
| Nancy Schenck | 220 | 880 | 43.74 | 4,811 | 38,491 | 43,303 |
| Adam Englander | 50 | 150 | 66.65 | 1,666 | 9,998 | 11,664 |
| Greg Phillips (full time marekting employee) (b) | $ 13,350.84 | $ 4,450.28 | N/A | 6,675 | 4,450 | 11,126 |
| Jeri Wicker (full time marketing employee) (b) | 12,375.00 | 4,125.00 | N/A | 6,188 | 4,125 | 10,313 |
| Doreen Nichols (full time marketing employee) (b) | 18,294.11 | 6,098.04 | N/A | 9,147 | 6,098 | 15,245 |
| Merrill Kaemphert (full time marketing employee) (b) | 22,674.83 | 7,558.28 | N/A | 11,337 | 7,558 | 18,896 |
| Bob Jordan (full time marketing employee) (b) | 8,565.55 | 2,855.18 | N/A | 4,283 | 2,855 | 7,138 |
| **Contractors** | | | | | | |
| Mel Pohl | 280 | 40 | 218.41 | 30,577 | 8,736 | 39,314 |
| Terrance Porretto (Internet Marketing only Contractor) (b) | $ 31,290.00 | $ 10,430.00 | N/A | 15,645 | 10,430 | 26,075 |
| Jim Tracy (Marketing only contractor) (b) | 27,636.53 | 9,212.18 | N/A | 13,818 | 9,212 | 23,030 |
| Tom Brennan (Marketing only contractor) (b) | 30,981.77 | 10,327.26 | N/A | 15,491 | 10,327 | 25,818 |
| Darrell Prescott (Marketing only contractor) (b) | 4,500.00 | 1,500.00 | N/A | 2,250 | 1,500 | 3,750 |
| Carol Peake (Marketing only contractor) (b) | 13,001.25 | 4,333.75 | N/A | 6,501 | 4,334 | 10,834 |
| Stephen Levy-Mazin (Marketing only contractor) (b) | 13,370.30 | 4,456.77 | N/A | 6,685 | 4,457 | 11,142 |
| Rod Espudo (Marketing only contractor) (b) | 15,589.43 | 5,196.48 | N/A | 7,795 | 5,196 | 12,991 |
| Jack Fahey (Claudja, Inc, Marketing only contractor) (b) | 30,228.92 | 10,075.64 | N/A | 15,113 | 10,076 | 25,189 |
| Michael Polln (Marketing only contractor) (b) | 15,408.75 | 5,136.25 | N/A | 7,704 | 5,136 | 12,841 |
| November 20, 2004 - Present Subtotal | | | | | | 428,632 |
| **TOTAL** | | | | | | $ 540,347 |

Schedule 3

**LVRC Holdings v. Brekka**
**Marketing Expense Losses**
**April 2003 Through Present**

Provided By LVRC

|  | | | | Calculated | |
|---|---|---|---|---|---|
| | Non-Internet Marketing Hours or $s | Internet Marketing Hours or $s | Rate | 50% of Non-Internet Marketing (c) | 100% of Internet Marketing | Marketing Expense Losses |

Notes:
(a) Mr. Smith does not draw a salary. Based on the size of the company, an annual salary of $200,000 per year appears reasonable.
(b) LVRC has assumed that 75% is attributable to Non-Inter Marketing and 25% is attributable to Inter Marketing.
(c) Assumed 50% since most Non-Internet Marketing refers to LVRC's website.

15. According to LVRC company officers, all advertising and marketing activities undertaken by LVRC make reference to the LVRC website and refer potential clients there for additional information. As a result of Mr. Brekka's actions, potential clients attempting to access LVRC's website through commonly used search engines such as Google, may not see LVRC listed as prominently in a search because the keywords used have been diluted in their effectiveness by Mr. Brekka's actions. As a result, non internet marketing activities have been detrimentally affected.

16. To determine this loss to LVRC, I calculated the hours spent by employees and contractors on non internet advertising and marketing. Based on my discussions with company officers, it was estimated that the effectiveness of the advertising had been reduced by approximately 50% due to the actions of Mr. Brekka. Therefore, 50% of the expense of these employees and contractors was included in the loss to LVRC.

17. An additional category of loss to LVRC is the time spent by LVRC employees preparing and reviewing documents related to this action. The expense of these lost hours is included in the losses to LVRC attributable to the actions of Mr. Brekka. The details of my calculations of LVRC's loss are provided in Tab 2.

## EBS' Unjust Enrichment

18. I reviewed available information regarding EBS's annual revenue from January 1999 through March 2002, the period prior to Mr. Brekka's employment with LVRC. I also reviewed revenue for 2003. I have not yet received financial information subsequent to 2003 to determine if EBS was unjustly enriched due to the actions of Mr. Brekka. I reserve the right to update my report if additional information becomes available.

LVRC Holdings v. Brekka
Losses Related to LVRC v. Brekka

| Employee Name | Hours | Rate | Total Amount |
|---|---|---|---|
| Stuart Smith (a) | 860 | $ 100.00 | $ 86,000 |
| Brad Greenstein | 860 | 54.86 | 47,180 |
| Frank Szabo | 172 | 49.22 | 8,466 |
| Adam Englander | 100 | 66.65 | 6,665 |
| Debbie Champine | 40 | 25.87 | 1,035 |
| Dale Morris | 40 | 32.89 | 1,316 |
| Deyna Chavez | 40 | 21.40 | 856 |
| Mike Garone | 40 | 20.93 | 837 |
| Lynn Baumann | 340 | 56.50 | 19,210 |
| Kristine Clobes | 85 | 19.00 | 1,615 |
| All Staff Meeting | 3 | 1,036.98 | 3,111 |
| Total Employee Time Cost | | | 176,291 |
| Additional Hard Costs Postage/Copying/Phone | | | 5,000 |
| Losses Related to LVRC v. Brekka | | | $ 181,291 |

Notes:
Information obtained from LVRC. Rate includes salary, paid time off, bonuses, and 35% employer costs for taxes, insurance, medical/dental benefits, etc.
(a) Mr. Smith does not draw a salary. Based on the size of the company, an annual salary of $200,000 per year appears reasonable.

## Statement of Stuart Smith

My personal objectives in filing this lawsuit were as follows:

(1) To ensure that Mr. Brekka, Mrs. Quain and Employee Business Solutions, Inc. could not further disrupt and damage our corporation, interfere with our clients or otherwise utilize our proprietary company information and materials.

 (2) Receive compensation for the damages suffered as a result of the unlawful activities and behaviors that Mr. Brekka, Mrs. Quain, and Employee Business Solutions, Inc.  Also to collect any punitive damages the Court may assess for the activities and behaviors of the defendants.

(3) To receive equitable relief available to LVRC Holdings under the law.

_____
Stuart Smith

Subscribed and sworn to before me
this  27  day of July, 2006.

_____
Notary Public

DEBORAH A. CHAMPINE
Notary Public, State of Nevada
Appointment No. 99587331
My Appt. Expires July 1, 2007